208 So.2d 917

**CITY OF FAIRHOPE**

v.

**TOWN OF DAPHNE.**

**TOWN OF DAPHNE**

v.

**CITY OF FAIRHOPE.**

I Div. 262.

Supreme Court of Alabama.

April 4, 1968.

Ernest M. Bailey and Richard C. Lacey, Fairhope, for appellant-appellee City of Fairhope.

Lyons, Pipes & Cook, Mobile, for appellant-appellee Town of Daphne.

COLEMAN, Justice.

Both sides appeal from a declaratory decree construing a contract made in 1950 by the Town of Daphne and the City of Fairhope.

The contract provided that, subject to the provisions of the contract, Daphne shall have the right to purchase from Fairhope a gas distribution system located in Daphne, and also, a one-tenth interest in a gas transmission pipe line running from the source of supply, several miles north of Daphne, to the corporate limits of Daphne. The transmission line continues on south from Daphne to Fairhope.

The distribution system in Daphne and the transmission line were constructed by

Fairhope according to the contract. Fairhope had also constructed a distribution system located in that city. In order to supply increased needs of both parties, a second pipe line has been constructed as provided in the contract.

Two questions are in dispute, to wit: first, the price Daphne shall pay; and, second, the nature of the "interest" which Daphne shall acquire in the transmission lines located between the source of supply and the corporate limits of Daphne.

Daphne filed its bill praying for construction of the contract.

The court declared, in effect, that Daphne shall pay to Fairhope $66,240.53; that Daphne shall acquire full title to and ownership of the distribution system located in Daphne; but Fairhope shall remain the owner of the transmission lines, subject only to Daphne's right to purchase one-tenth of the volume of the gas in both pipe lines as provided in the contract.[1]

Fairhope complains that the court erred in fixing the amount of the purchase price at an amount less than it ought to be under the contract.

Daphne complains that the court erred in declaring that Fairhope shall remain owner of the pipe lines. Daphne says it is entitled to ownership of an undivided one-tenth interest in the pipe lines and not merely the right to purchase one-tenth of the gas.

## 1. Price.

Fairhope has not set out in its brief a condensed recital of the testimony of each witness as required by Supreme Court Rule 9(b).

It is not clear from Fairhope's brief precisely what Fairhope claims the purchase price should be. The contract fixes the price to be paid by Daphne to include three elements as follows:

(a) one-tenth of the principal remaining unpaid of bonds issued for contruction of the gas system, plus interest;[2]

(b) If it shall become necessary to increase the capacity of the transmission line, the cost shall be paid by Fairhope and Daphne in the proportion that the needs of each has increased and the cost of such increased needs "shall be added to the cost to Daphne in the acquisition of ownership";[3] and

---

1. The decree recites:

"1. That upon the Complainant paying to the Respondent in cash the sum of SIXTY-SIX THOUSAND TWO HUNDRED FORTY AND 53/100 ($66,240.-53) DOLLARS, and installing and paying the cost of installation of a proper metering system to meter the gas to be distributed through the gas distribution system located within the limits of the Town of Daphne as they now exist (said metering system to be ready for operation on the date of purchase); that the Respondent shall promptly execute and deliver to Complainant written instrument conveying to Complainant free and clear of all items and encumbrances,

"(a) the entire gas distribution system within the limits of the Town of Daphne as same now exists, including, but withint limitations, all pipe lines, gauges, valves, meters, appliances and equipment of every kind and nature used in connection therewith;

"(b) that the City of Fairhope, Respondent, is the owner of the gas transmission pipe lines, subject to the right of

the Town of Daphne, the Complainant, to 1/10th of the volumn thereof as specified in the contract of January 23, 1950.

"2. That subsequent to the sale and transfer as herein ordered, Respondent shall operate and maintain both gas pipe lines, and pay all expenses connected therewith and make available to the Complainant at all times 1/10th of the gas as provided by said contract as herein set out."

2. The contract recites:

"FIFTH: The Town of Daphne hereby reserves to its self, and the City of Fairhope hereby grants to the Town of Daphne, the right and option to purchase that portion of the said proposed natural gas distribution system within the corporate limits of the Town of Daphne and a one-tenth interest in that portion of the gas transmission pipe line lying between the Town of Daphne and the United Gas pipe line, the source of supply of natural gas, on February 1st., 1955, or at any time thereafter, upon the Town of Daphne's paying to the City of Fair-

(c) if the corporate limits of Daphne shall be enlarged before Daphne shall purchase, the purchase price shall be increased in an amount equal to the fair and reasonable value of system owned by Fairhope within that territory added to Daphne by extension of the corporate limits.[4]

The contract contains a provision whereby Daphne could lease the distribution system if Daphne so elected, and the references in the contract as to rental or lease relate to the lease provisions. Daphne did not elect to lease, however, and those references do not have any effect on the amount of the purchase price.

(a) The court found that Fairhope did issue "its bonds for the construction of the gas distribution system and gas transmission pipe line contemplated in the agreement," and that the amount of the principal remaining unpaid on the bonds issued "for the construction of such gas distribution system and gas transmission pipe line originally constructed by the Respondent in 1950," plus interest, was $294,865.25.

As we understand the testimony of Fairhope's witness, Marx, he testified that the unpaid amount of the bonds, plus interest, on the day of the trial, was $294,865.25. Ten per cent of that amount is $29,486.525.

(b) The parties stipulated that the cost of the second transmission line was $216,000.00, and that, for the purposes of the "NINETH" paragraph of the contract,

hope one-tenth of the principal remaining of the unpaid bonds issued for the construction of such gas system and one-tenth of all past due interest and one-tenth of accrued interest to the date of execution and delivery of a proper instrument passing ownership thereof to the Town of Daphne. . . . Daphne shall, it its own expense, install a proper metering system to meter the gas distributed through that portion of the system within the corporate limits of the Town of Daphne, and the same shall be ready for operation on the date of its purchase. Within ten days after the receipt of such notice the City of Fairhope and the trustee aforesaid shall advise Daphne in writing the amount of unpaid principal on such bonds and the amount of interest in arrears, if any, and the amount of interest that will have accrued to the proposed date of purchase; and on such date the Town of Daphne shall pay over to the City of Fairhope the purchase price above provided, upon the delivery to it of a proper instrument of conveyance as aforesaid."

3. The contract recites:

"NINETH: In the event it shall become necessary to increase the capacity of that portion of gas transmission pipe line lying between Daphne and the source of supply, the cost thereof shall be paid by the City of Fairhope and by the Town of Daphne in the proportion that the needs of each has increased beyond the proportions specified herein, that is, if the need for increased capacity shall be solely due to the increased needs of Fairhope beyond its ninety per cent of the capacity of such transmission line,

Fairhope shall pay the entire cost and if the need for increased capacity shall be due to the increased need of Daphne beyond its ten per cent proportion, Daphne shall pay the entire cost; but if both shall need increased capacity, then the cost of increasing such capacity shall be borne by them in the proportion that each needs such increased capacity. If Daphne's increased needs shall require the transmission line to be enlarged before Daphne shall have acquired ownership or shall lease as herein provided, then the cost of such increased needs shall be added to the cost to Daphne in the acquisition of ownership, . . ."

4. The contract recites:

"THIRTEENTH: The price for purchase by the Town of Daphne of the distribution system within the corporate limits of the Town of Daphne and of the interest in the transmission line as herein provided and the rentals herein provided for leasing of the same are based upon the estimated number of protential customers within the corporate limits of the Town of Daphne as they now exist. In the event the corporate limits of the Town of Daphne shall be enlarged at any time before Daphne shall purchase under this contract or at any time before or during the time Daphne shall be leasing under this contract, then the purchase price and rentals shall be increased in an amount equal to the fair and reasonable value of the gas system owned by the City of Fairhope within that territory added to the Town of Daphne by the extension of the corporate limits. . . ."

Daphne's increased needs were 12.15% and Fairhope's 87.85%. Twelve and fifteen hundredths per cent of $216,000.00 is $26,244.00.

(c) Daphne's witness, Maples, a civil engineer of ten years' experience, testified that, in his opinion, the value of the system, to serve the thirty-two additional users taken in by Daphne in the newly annexed area, was approximately $10,000.00. The court found that the value of the system in the annexed area is $10,510.00.

 It thus appears that the price to be paid by Daphne was fixed as follows:

| | |
|---|---|
| (a) One-tenth of unpaid cost of original transmission line and distribution system | $29,486.53 |
| (b) 12.15% of cost of second transmission line | 26,244.00 |
| (c) System in newly annexed area | 10,510.00 |
| Price fixed by court | $66,240.53 |

Fairhope has not shown that the purchase price fixed by the court was error.

### 2. Daphne's interest.

Daphne's contention is that the court erred in restricting Daphne's interest in the transmission line to a mere right to purchase one-tenth of the gas. In replying to Daphne's contention, Fairhope relies on a single proposition of law, to wit:

"IN DETERMINING THE EFFECTS OF A CONTRACT THE COURT NOT ONLY HAS THE RIGHT BUT A DUTY TO PROBE BEHIND WRITTEN CONTRACTS AND TO EXAMINE ALL FACTS WHICH SHED ANY LIGHT UPON THE TRUE INTENTION OF THE PARTIES TO THE CONTRACT, AND TO CONSIDER THE CONTRACT IN ITS ENTIRETY WHERE AMBIGUITY EXISTS."

It thus appears that Fairhope's argument must rest on the premise that the contract is ambiguous or contains conflicting provisions. To show this ambiguity or conflict, Fairhope makes three points.

 First, Fairhope says that the contracting parties did not intend that Daphne acquire ownership of any part of the transmission line because no mention is made in the preamble of the contract that Daphne shall have such ownership.[5] It is true that Daphne's ownership of the transmission line is not mentioned in the preamble, but it is also true that Daphne's ownership of a distribution system is not mentioned in the preamble. It does not appear that even Fairhope contends that Daphne shall not acquire ownership of the distribution system located in Daphne. We are advised of no rule of law which requires the preamble of a contract to mention every provision of

5. The preamble recites:
"THAT WHEREAS, the City of Fairhope proposes to construct, maintain and operate a gas transmission pipe line from the United Gas Pipe Line through the Town of Daphne for the purpose of supplying natural gas to the people of Fairhope and Daphne and to communities, individuals and enterprises along such gas transmission pipe, and to construct, maintain and operate a distribution system or systems to serve such proposed gas users, and to issue gas revenue bonds to construct the same and to secure such bonds by deed of trust, with the Merchants National Bank of Mobile as Trustee;

"THAT, WHEREAS, the Town of Daphne did on the 23rd day of January, 1950, grant a franchise to the City of Fairhope for the construction, operation and maintenance of a natural gas transmission pipe line and distribution system within and through the Town of Daphne, to serve the people of Fairhope, Daphne and other users of gas along such transmission pipe line. It is hereby agreed by and between them as follows:"

the agreement. This contract is not a legislative act and the preamble to a contract is not the title to a bill. The preamble can hardly be expected to mention every provision of the contract; and, the mere omission from the preamble of a provision which is fully stated in the contract, cannot reasonably be said to create an ambiguity or conflict.

The second point is that, in paragraph SECOND of the contract, no mention is made of Daphne owning any portion of the transmission line. A reading of paragraph SECOND scarcely supports this insistence. Paragraph SECOND is rather long and covers two transcript pages. In summary, it provides: that the object of the franchise granted by Daphne to Fairhope is to obtain a gas service for the people of Daphne; that Fairhope proposes to construct and operate a gas system for both municipalities, and others who can be economically served from its transmission lines, and to finance the same by issuing revenue anticipation bonds; that gas shall be furnished for reasonable rates, but rates within Daphne shall not be greater than rates within Fairhope; that the franchise to construct the transmission line through Daphne is irrevocable and subject only to the rights Daphne may acquire under the contract, and the franchise to construct a distribution system in Daphne is subject to the agreement providing for ultimate ownership of the Daphne system by Daphne; that if Fairhope shall not "commence construction of the gas system, franchise for which was granted by" Daphne to Fairhope, such franchise shall be null and void; that if such system shall be constructed and, within six months after completion of the transmission line through Daphne, Fairhope shall not have constructed or be in process of constructing a distribution system in Daphne, the franchise to construct and operate a distribution system in Daphne shall be null and void, but the franchise for the transmission line "through the town of Daphne" shall remain in effect; and

"In the event Fairhope shall construct the gas transmission pipe line through the Town of Daphne, but shall not construct a distribution system within the corporate limits of the Town of Daphne, and its franchise shall lapse as above provided, and Daphne shall t(h)ereafter determine to construct a distribution system within the corporate limits of the Town of Daphne, the City of Fairhope agrees that it will sell to the Town of Daphne a one-tenth interest in that portion of the gas transmission pipe line between the Town of Daphne and the source of supply, the purchase price to be one-tenth of the cost of the entire gas transmission pipe line as determined by the amount paid to the contractor for such construction."

Here in paragraph SECOND there is clear expression of the intent that, in event Daphne acquires title to its distribution system by constructing it, Fairhope will sell to Daphne "a one-tenth interest" in the transmission line. There is nothing to limit the quality of Daphne's "one-tenth interest" to a mere right to purchase gas.

The third point relied on to support Fairhope's contention is that no provision is made in the contract for payment to Daphne of any profits from the transmission line. A reading of the entire contract does not suggest that the parties expected or intended to make a profit on operation of the gas line by itself. In the entire operation, the only source of revenue is the sale of gas to consumers. The profit, if any, would have to come after the gas has left the transmission line and has gone to consumers. There is no provision for Fairhope to derive any profit from the transmission line either. In fact, the provisions of paragraph THIRD of the contract appear to negative the idea of profits from the transmission line and to provide merely that Daphne, after acquisition, shall pay one-tenth of cost of operating the transmission line and the cost of gas metered to Daphne. The concluding sentence of paragraph THIRD recites:

."Daphne will pay one-tenth of the cost of operating, repairing and maintaining such gas transmission pipe line and one-tenth the cost of odorizing gas therein, and one-tenth the cost of insurance thereon, and for all gas metered to it (Daphne), plus its proportionate part of the gas lost in transmission, payments hereof shall be made upon presentation of bill therefor." (Par. Supplied)

The trial court decreed correctly that Daphne will pay to Fairhope "for all gas metered to it at the same rate that the said Respondent purchases gas (for) from the source of supply." (Par. Supplied)

Thus there will be no profit from operation of the transmission line per se, and, therefore, no reason to provide in the contract for distribution of such nonexistent profits to either party.

To support the conclusion that the parties intended that Fairhope retain complete ownership of the transmission line, "but to allow Daphne to purchase *an interest in the gas delivered* up to ⅒th of the volume of gas," two isolated sentences which appear near the end of paragraph THIRD are relied on.[6]

Paragraph THIRD deals with Daphne's acquiring *ownership* of the Daphne distribution system and one-tenth of the transmission line located between the source of supply and Daphne. The first sentence in the paragraph requires that, until Daphne shall acquire the distribution system and interest in transmission line, the revenue from the system shall be used as provided by the ordinance authorizing issue of the bonds and the deed of trust executed to secure the bonds. We interpolate here that paragraph

6. Paragraph THIRD recites:

"THIRD: Until such time as Daphne shall acquire the distribution system within the corporate limits of the Town of Daphne, and an interest in the transmission pipe line the revenue derived from the operation of such natural gas system proposed to be constructed, whether operated by the City of Fairhope as an entirety or by the City of Fairhope and by the Town of Daphne under the lease agreement herein provided, shall be used as provided by the ordinance authorizing issuance of, and by the deed of trust executed by the City of Fairhope to secure gas revenue bonds issued for the purpose of constructing such gas system.

"The Town of Daphne shall acquire the ownership of the natural gas distribution system within the corporate limits of Daphne and one-tenth interest in that portion of the natural gas transmission pipe line lying between the Town of Daphne and the United Gas pipe line, the source of supply of natural gas, in either of the following manners:

"(1.) When through the operation by the City of Fairhope of the entire natural gas system the bonds issued for the construction of the same shall have been paid in full, principal and interest.

"(2.) The purchase by the Town of Daphne of such distribution system and such interest in such portion of said transmission pipe line.

"(3.) When Daphne, having elected to lease the distribution system within the

corporate limits of the Town of Daphne, shall have paid in full the one-tenth of the principal and interest of the bonds outstanding at the time it shall elect to lease the same, and any and all other amounts required to be paid by Daphne under the lease agreement.

"When Daphne shall acquire the ownership of said distribution system and interest in said transmission pipe line, the City of Fairhope will by appropriate instrument convey the same to the Town of Daphne. After it shall have acquired the ownership of the distribution system and the interest in the transmission pipe line Daphne shall at all times be entitled to gas from such transmission pipe line to supply its distribution system in such quantities as shall be required by it up to the amount of one-tenth of the volume delivered by the source of gas supply into such transmission pipe line. Fairhope shall continue to operate and maintain such transmission pipe line and make available to Daphne one-tenth of the volume delivered by the source of gas supply into such transmission line. Daphne will pay one-tenth of the cost of operating, repairing and maintaining such gas transmission pipe line and one-tenth the cost of odorizing gas therein, and one-tenth the cost of insurance thereon, and for all gas metered to it, plus its proportionate part of the gas lost in transmission, payments hereof shall be made upon presentation of bill therefor."

TENTH provides that nothing in the agreement between Fairhope and Daphne shall invalidate or abridge the rights of the bond holders.

The next sentence of paragraph THIRD provides three alternate methods by which Daphne "shall acquire the *ownership* of the natural gas distribution system within the corporate limits of Daphne and one-tenth interest in that portion of the natural gas transmission pipe line lying between the Town of Daphne and . . . the source of supply . . ." (Emphasis Supplied.) The next sentence requires that when Daphne shall acquire "*ownership* of said distribution system and interest in said transmission pipe line," (Emphasis Supplied.) Fairhope will convey the same to Daphne by appropriate instrument.

Next are the two sentences relied on to support the conclusion that Fairhope retain complete ownership of the pipe line. The first sentence provides that, after Daphne has acquired "*ownership* of the distribution system and the intere*d*st in the transmission pipe line," (Emphasis Supplied.) Daphne shall be entitled to one-tenth of the gas delivered by the source of supply into the pipe line. The second sentence relied on provides that Fairhope shall continue to operate the line and make one-tenth of the gas available to Daphne. The next sentence is the last in paragraph THIRD and provides that Daphne will pay one-tenth of cost of operating and maintaining the line and odorizing the gas, one-tenth of cost of insurance, and for all gas metered to Daphne plus its proportionate part of gas lost in transmission.

The two sentences relied on contain nothing inconsistent with the previously expressed intent that Daphne is to acquire unqualified *ownership* of one-tenth of that portion of transmission line located between source of supply and Daphne. Daphne's ownership is to be one-tenth of the line; and, of the gas transmitted Daphne is to have one-tenth available to it and is to pay one-tenth of the cost of operating and maintaining the line and for the gas metered to Daphne. There is no conflict between the intent that a party shall own one-tenth of the transmission line and the intent that such owner shall have available to it one-tenth of the gas transmitted and shall pay the cost of such gas and the cost of making that proportion of the gas available to the one-tenth owner.

The right to such use and the obligation to pay such costs, here conferred on Daphne, are merely the consequences which usually and ordinarily accompany ownership of an interest in property.

■ Even if there were conflict between the two sentences and the previously expressed intention that Daphne should acquire ownership, the intention first expressed must control. The rule declared by this court is that if there exists inconsistency between two clauses of a contract which cannot be reconciled, the inconsistency must be resolved in favor of the prior clause, unless an intention to thereafter qualify is plainly expressed. Lowery v. May, 213 Ala. 66, 104 So. 5; Epperson v. Stacey, 266 Ala. 396, 397, 96 So.2d 750. The prior sentences of paragraph THIRD say, without qualification, that Daphne "shall acquire the ownership." The subsequent two sentences relied on certainly do not "plainly express" an intention to cut down or qualify Daphne's ownership of one-tenth of the transmission line.

■ All the provisions of a contract must be construed together so as to give harmonious operation to each of them, so far as their language will reasonably permit. Manchester Sawmills Co. v. A. L. Arundel Co., 197 Ala. 505, 73 So. 24.

Paragraph THIRD provides three optional methods for Daphne to acquire " . . . the ownership of the natural gas distribution system within the corporate limits of Daphne and one-tenth interest in that portion of the natural gas transmission pipe line lying between the Town of Daphne and the United Gas pipe line, the source of

supply of natural gas . . .." Daphne elected to acquire such ownership by purchase under option (2).

We conceive no reason to suppose that, by mentioning one thing first and another second, the parties intended to convey "ownership" of the first item mentioned and something less than ownership of the second item. The usual and ordinary meaning of an agreement whereby the first party agrees to sell to the second party "ownership of a horse and a cow" is that the second party shall acquire ownership of both animals, not merely ownership of the horse and something less than ownership of the cow, such as the right merely to pay for feeding the cow and to purchase her milk.

In paragraph FIFTH, see note 2, Fairhope grants to Daphne the right to purchase " . . . that portion of the said proposed natural gas distribution system within the corporate limits of the Town of Daphne and a one-tenth interest in that portion of the gas transmission pipe line lying between the Town of Daphne and . . . the source of supply . . . upon . . . Daphne's paying to , . . . Fairhope one-tenth of the principal remaining of the unpaid bonds . . . and one-tenth of accrued interest to the date of execution and delivery of a proper instrument passing *ownership* thereof to the Town of Daphne. . . ." (Emphasis Supplied.) Paragraph FIFTH makes no distinction between ownership of a portion of the distribution system and a portion of the transmission line. The quality of interest to be conveyed is the same for both items.

Paragraph SEVENTH provides:

"Whenever Daphne acquires the *ownership* of the said portion of transmission line and the distribution system within the Town of Daphne . . . Fairhope will pay over to Daphne all customer's deposits held by it for . . . users within . . . Daphne . . ." (Emphasis Supplied.)

Paragraph NINTH provides:

" . . . If Daphne's increased needs shall require the transmission line to be enlarged before Daphne shall have acquired *ownership* . . . the cost of such increased needs shall be added to the cost to Daphne in the acquisition of *ownership* . . ." (Emphasis Supplied.)

If the parties had intended for Daphne to acquire ownership of that portion of the distribution system located in Daphne, but something less than ownership of a one-tenth interest in that portion of the transmission line located between Daphne and the source of supply, the parties could and doubtless would have so provided by appropiate language in this carefully drawn contract.

■ We are of opinion that there is no competent evidence in this record which tends to show the intention of the parties except the language of the contract itself. For the reasons we have undertaken to express, we are of opinion that the intent of the parties clearly expressed in the entire contract is that Daphne should acquire unqualified ownership of both the one-tenth interest in that portion of the transmission line located between Daphne and source of supply and that portion of the distribution system located in Daphne.

Of the $66,240.53 constituting the total purchase price, an unspecified portion of $29,486.53 is for 10% of the cost of the first transmission line; all of $26,244.00 is for 12.15% of the cost of the second line. Daphne agreed to pay these substantial sums for purchase of ownership of interest in the line, not for the mere right to be allowed "to purchase an interest in the gas delivered."

■ Contracts must be construed as the parties made them. To cut down Daphne's interest in the transmission lines to a mere right to purchase gas, it is necessary to

write language into the contract which the parties themselves did not put there.

We reverse the decree insofar as it holds Daphne's interest in the transmission lines to be less than unqualified ownership.

The decree is affirmed insofar as it fixed the amount to be paid by Daphne at the sum of $66,240.53.

The decree is reversed insofar as it declares that Fairhope shall convey to Daphne less than ownership of an interest in the transmission lines running from the source of supply to Daphne, and the cause is remanded with directions that a decree be entered declaring that Fairhope shall convey to Daphne unqualified ownership of a one-tenth interest in the first transmission line and an interest of 12.15% in the second transmission line.

The decree should provide that Daphne shall pay one-tenth of the cost of operating and maintaining the first transmission line and 12.15% of the cost of operating and maintaining the second transmission line.

In the respect declaring that Daphne shall pay for all gas metered to it at the same rate that Fairhope purchases gas for from the source of supply, the decree is affirmed. Daphne should pay its proportionate share of the cost of gas lost in transmission and of all expenses connected therewith as provided in the contract.

The costs of appeal are taxed equally against both parties.

Affirmed in part.

Reversed in part and remanded with directions.

LAWSON, SIMPSON, GOODWYN, MERRILL, and HARWOOD, JJ., concur.

LIVINGSTON, C. J., dissents.